## SUPREME COURT.

The People *ex rel.* George Gearn and others agt. Daniel Farrington and others.

According to the act of May 25, 1836, the " Trustees of the Theological Seminary of the Associate Reformed Church of New York," were to be chosen by the *Associate Reformed Synod of New York*, at their annual meeting.

In this case there was shown to be in existence *two* religious assemblies, each claiming to be the Associate Reformed Synod of New York, and as such entitled to choose trustees of this seminary—a formal election of trustees had been made by each of these bodies,

*Held,* that the assembly from which the *relators* derived their title had the better claim to be regarded as the true and properly constituted Associate Reformed Synod of New York, and were entitled to the office.

That the action of the persons who constituted the body from which the defendants derived their title was premature and irregular; that it was a *secession* from the true synod, and could not be relied upon to confer any legal rights. (*Disclosing an interesting history of this church.*)

*Poughkeepsie Special Term, July* 3, 1861.

THIS was an action in the nature of " *quo warranto*" to try the title of the defendants to the office of " Trustees of the Theological Seminary of the Associate Reformed Church," and to have the relators declared entitled to such office.

" The trustees of the Theological Seminary of the Associate Reformed Chuch" are a body corporate, created by an act of the legislature, (*Laws of* 1836, *p.* 744.) The power to elect trustees of said corporation is vested by the said act, in the " Associate Reformed Synod of New York, at their annual meeting," (*sec.* 3.)

The Associate Reformed Synod of New York is a " Particular Synod," and is composed of several " Presbyteries" met together, (*page* 506, *Book of Discipline.*) The " Presbytery" consists of all the ministers within a certain district, each accompanied by a ruling elder commissioned from the session, (*p.* 490.) The officers of a synod are a moderator and a clerk. The clerk may be a member of the synod or not, as may be deemed expedient, and holds his office during the pleasure of the synod. Every stated meeting of a synod is to be opened by the moderator of the last preceding meeting, and in case of his absence, by the oldest minister present, (*pp.* 508, 509.)

A regular meeting of the Associate Reformed Synod of New York was held at the Jane street church, New York, Oct. 21, 1857. At this meeting, Rev. George C. Arnold was chosen moderator, and served as such. Rev. Mr. Scouller was and long had been clerk. These persons held their respective offices when the synod adjourned, having

resolved to hold their next regular annual meeting at York, on the second Monday of October, 1858, at ten o'clock A. M. Up to this point there is no question raised as to the regularity of the proceedings of the synod.

On the morning of the 2d Monday of October, 1858, at the place in York, selected for the meeting of the synod, the occurrences took place, which resulted in the existence of two bodies, each claiming to be the " Associate Reformed Synod of New York." Under one of such bodies the relators claim their right to the office of trustees, and the defendants under the other.

There is no question made as to the election of either set of trustees by the body under whom they claim, nor that both of said bodies have been kept up by regular adjournments down to the present time.

The members of the Associate Reformed Synod of New York, on the 2d Monday of October, 1858, were forty-five ministers, and the ruling elders accompanying them. Thirty of such ministers (with their elders) were actually present at the time and place of meeting at York.

Mr. Arnold, the moderator, and Mr. Scouller, the clerk, of the last meeting of the synod, were present, ready to perform their respective duties.

Rev. Mr. Farrington, at five minutes before ten o'clock, according to plaintiffs' witnesses, and at ten o'clock, according to defendants' witnesses, made a motion that " in the absence of the moderator, who had connected himself with another religious body," Rev. Dr. McCarrell be moderator *pro tem.* No vote was taken on the motion, but Dr. Mc Carrell immediately took the chair. Rev. Mr. McNulty then made a motion " that the clerk of the synod being absent, and having connected himself with another body, Rev. R. Howard Wallace be clerk *pro tem.*" This motion was declared carried. Dr. McCarrell having made a short prayer, Mr. Farrington then moved an adjournment to another place, which was put and declared carried. Sixteen

persons—nine ministers and seven laymen—including all the persons who had participated in the above proceedings, then left the building, and having met in another place, elected the defendants trustees of the theological seminary.

At ten o'clock, at the place designated for the meeting, the synod was organized by Mr. Arnold as moderator, and Mr. Scouller as clerk, and the relators were elected trustees by such synod at that and their subsequent yearly meetings.

The General Synod of the Associate Reformed Church, at its meeting in May, 1858, had adopted a basis of union with the " Associate Church," which basis is contained in following resolutions :

" *Adoption of the testimony.*—The Associate Synod, in May, 1857, in the city of Philadelphia, adopted the basis; and the Associate Reformed Synod at the same time in New York city also adopted it. The Associate Synod at the same meeting declared how she understood the language of the Associate Reformed Synod in her adopting act on the subject of forbearance. The following preamble and resolutions were adopted by both synods, on the day preceding the consummation of the union, in Pittsburgh, May 25th, 1858 :

" *Whereas,* it is understood that the testimony submitted to the General Synod of the Associate Reformed Church by the Associate Synod was proposed, and accepted as a term of communion, on the adoption of which the union of the two churches is to be consummated :

" *And whereas,* it is agreed between the two churches that the forbearance in love which is required by the law of God, be exercised toward any brethren who may not be able fully to subscribe to the standards of the united church, while they do not determinedly oppose them, but follow the things which make for peace, and things wherewith one may edify another :

" *Resolved,* 1*st,* That these churches, when united, shall

be called the " United Presbyterian Church of North America."

" *Resolved*, 2*d*, That the respective presbyteries of these churches shall remain as presently constituted until otherwise ordered, as convenience shall suggest.

" *Resolved*, 3*d*, That the supreme court of this church shall be a general assembly, to meet annually, to be composed of delegates from the respective presbyteries, the number of delegates to be according to the proportion of the members constituting each presbytery, as now fixed by the rules of the Associate Reformed Church, until a change shall be found expedient.

" *Resolved*, 4*th*, That there shall be subordinate synods, and these shall be the same as those now existing in the Associate Reformed Church, to which synods the different presbyteries in the Associate Church shall attach themselves for the present, according to their location : *Provided*, that the separate synods and presbyteries of the said Associate Reformed and Associate Churches shall also continue as at present constituted, until otherwise directed.

" *Resolved*, 5*th*, That the general and subordinate synods shall be regulated according to the rules presently in force in the Associate Reformed Church, until the united church shall see fit to alter such rules.

" *Resolved*, 6*th*, That the different boards and institutions of the respective churches shall not be affected by this union, but shall have control of their funds, and retain all their corporate or other rights and privileges, until the interests of the church shall require a change."

Messrs. Arnold and Scouller, the moderator and clerk above named, and those who acted with them, approved of this union ; but the persons who withdrew as above stated, opposed such union, claiming that the General Synod had no jurisdiction to make it, and that those persons who adhered to such union ceased to be members of the Associate Reformed Church.

E. A. Brewster and E. L. Fancher, *for plaintiffs.*
T. McKissock and A. C. Niven, *for defendants.*

Emott, Justice. This is an action of *quo warranto,*
brought to obtain a judgment of *ouster* against the defend-
ants, who are alleged to have intruded into the office of
trustees of the theological seminary of the Associate Re-
formed Church of New York. The relators claim to be
entitled to this office as the duly and legally elected trus-
tees, while the defendants deny the validity of the relators'
election, and allege a better title in themselves by a dif-
ferent election made by a different constituent body. The
question of legal right which thus arises is the only ques-
tion in the cause, a consideration which it will be neces-
sary to keep in mind in the examination which we are to
make.

The office was created by an act of the legislature of the
state of New York, passed May 25th, 1836. According to
this act, the trustees of the seminary which was then incor-
porated, were to be chosen by the Associate Reformed
Synod of New York, at their annual meeting. It is there-
fore the relators' case to establish that they were duly
elected to this office by the Associate Reformed Synod of
New York at its annual meeting next preceding the com-
mencement of this action. The burden of proof is of course
upon the relators ; the defendants are in possession of the
office, and they can only be ousted by a better title.

The question in this case, however, is not as to the regu-
larity of the election of the relators, strictly speaking, but
upon the identity of the constituent body by which the
election must be made. There are shown to be in exis-
tence two religious assemblies, each claiming to be the
Associate Reformed Synod of New York, and as such, enti-
tled to choose trustees of this seminary. A formal elec-
tion of trustees has been made by each of these bodies, and
the question which I am called to determine is, whether

the assembly from which the relators derive their title has the better claim to be regarded as the true and properly constituted Associate Reformed Synod of New York.

The Associate Reformed Church in this country is a Presbyterian Church, adhering to a government by presbyters or ministers of equal grade, and ruling elders chosen by the congregations. This government is administered through church sessions or congregational judicatories, through presbyteries consisting of the ministers of a certain district together with a ruling elder from each congregation, and through particular and general synods which are constituted from the presbyteries.

The Synod of New York has occupied the position and relations of a particular synod in the Associate Reformed Church, at least since 1855, in which year it united with other particular synods of the same communion, known as the Synods of the West, and a body was constituted out of the union styled the General Synod of the Associate Reformed Church.

The organization of these particular synods, including the Synod of New York, consists of a moderator or presiding officer and a clerk. The moderator is chosen by each annual synod to preside during that synod, and it is also his duty to open the session of the next ensuing synod, and to conduct its proceedings until it has itself become organized by the choice of its own moderator. The book of discipline and church government of the Associate Reformed Church expressly requires (book 1, chap. 7) that every stated meeting of a synod shall be opened with a sermon and prayer by the moderator of the last assembly, and that he shall preside until another moderator shall be chosen. This is the only regular and recognized mode of procedure in these assemblies, unless the last moderator is absent, when the oldest minister present is to take his place.

The Synod of New York met in the city of New York on the 21st of October, 1857, and elected the Rev. George

C. Arnold moderator. He presided during the session of 1857, and the Rev. James B. Scouller was the clerk. At the close of their proceedings the synod adjourned to meet in the village of York, on the second Monday of October, 1858, at ten o'clock A. M. It was at this time and place appointed for the meeting of the synod of 1858, that the occurrences took place which resulted in the formation of two bodies, each claiming to be the Associate Reformed Synod of New York.

It will be seen by what has been said, and still more clearly by referring to the testimony in the case, that it was the right and the duty of Mr. Arnold, if he were present, to open, and in the language of the standards of this church, " constitute" the synod at York in October, 1858, and to act as its presiding officer until its moderator was chosen. It will also be seen that it was the right and the duty of Mr. Scouller to act as the clerk of that body upon its organization, to furnish its roll or list of members, and to receive and examine their credentials under the direction of the moderator.

When the third Monday of October in 1858 arrived, a considerable number of ministers and elders were present in the church at York appointed for the place of meeting of the synod, and there is no dispute that among them were Messrs. Arnold and Scouller. About ten o'clock, either a few minutes before or a few minutes after, and which it is impossible to say, in the irreconcilable discrepancy as to time among the witnesses, all of them evidently conscientious and religious men—and fortunately the precise moment is in my judgment wholly immaterial—at about ten o'clock, and before Mr. Arnold had taken his seat or proceeded to open the synod in the ordinary manner, one of the members of the synod, the Rev. Mr. Farrington, rose and moved that Dr. McCarrell take the chair. It is not very clear whether this motion was put to the vote. It was accompanied with the statement that Mr. Arnold had

connected himself with another ecclesiastal body, implying that he had ceased to be a member of that synod, and assuming that he was potentially if not literally *absent*, so that the contingency had occurred in which, according to the discipline of the church, the oldest minister present was to preside, (*book* 1, *chap.* 7, *sec.* 1.)   Dr. McCarrell took the chair, called to order, and made a short prayer.   A motion was then made that Mr. Wallace should be clerk, accompanied with a statement that Mr. Scouller had also ceased to be a member of the body in the same way as the last moderator.   Dr. McCarrell put it to vote and pronounced it carried.   A motion was then made to adjourn to another building, which was carried, when the ministers and elders who had taken part in these proceedings left the church, and assembled separately elsewhere, claiming to be the true and lawful Associate Reformed Synod of New York. These persons who effected an organization in the manner which has now been described, were a minority of the ministers and elders present and accredited to the synod in the usual way.   They numbered sixteen only, nine ministers and seven elders.

After these proceedings had taken place, Mr. Arnold proceeded in the ordinary manner, together with Mr. Scouller, to conduct devotional exercises, and afterwards to open the proceedings as a synod of the persons who remained, and who, as has been stated, constituted a very considerable majority of the original body.   They also claimed to be and to act as the Associate Reformed Synod of New York.   Each body thus had its adherents, ministers, elders and presbyters, and each has continued its organization and its claims down to the present time.   Each of these bodies elected trustees of the theological seminary, at that sitting for the year 1858.   The minority organization adjourned their assembly to the 16th of June, 1859, when they met, claiming to be the Associate Reformed Synod of New York for 1859, and elected the present defendants

trustees. The majority organization adjourned to October 4th, 1859, and at that meeting the relators weré chosen trustees by the vote of the synod which they contend continued to be the synod of New York.

Thus the court is driven to determine which of these two bodies has the better claim of right to be the constituent body which is to choose the trustees of this seminary. This is indeed the only question in the case. It is not a question of theological doctrines, unless these should turn out to be involved in the question of the constitution of these rival synods, which, I think, is not the fact. Nor is it a question of the discharge of a trust, or the application of trust funds. We are simply to determine now who are the trustees, and that depends upon the determination as to which of the two synods whose history and constitution are disclosed by the evidence, is legally entitled to be recognized as the Associate Reformed Synod of New York.

The proceedings of the party or body from whom the defendants derive their title, have in effect shifted the burden of proof upon the issue. At the origin of their separate organization in 1858, the persons who acted with Mr. Farrington and Dr. McCarrell, asserted and assumed that the officer who was authorized and required by their discipline to constitute the synod, was to be considered as *absent*, and after they had perfected their distinct organization they proceeded to separate from themselves, and thus from the rights and privileges of membership in the synod of the church, if they were that body, all those of their number who had been concerned in the proceedings or had sanctioned the acts of which they complained. Such a forfeiture as this, affecting in this case not only ecclesiastical privileges but temporal rights, cannot be presumed, it must be proved. Although, therefore, by the form of the issue and the nature of the case, the relators must establish their title to the office in question, yet in point of fact, upon this evidence, the defendants are compelled to make

out that the moderator of the synod of 1857 should have been considered by the synod of 1858, and must be regarded by the courts not to have been present when the synod of 1858 was organized. Otherwise the proceedings of the minority at that time were irregular and unjustifiable, and the first and initiatory step in the title of the defendants fails. This is the hinge of the present controversy. If Mr. Arnold and those who remained and acted with him, were at that time members of the synod, and entitled to be recognized as such; if they had not forfeited and positively lost these rights and privileges, the proceedings which constituted the synod from which the defendants derive their title were plainly invalid, and no legal rights could grow up out of them. Nor could any such rights subsequently attach themselves, so far as I can see, to a body which was illegal and invalid in its inception, even if the persons who composed the true synodical assembly, or the body itself, had subsequently been guilty of the gravest offences against the doctrine or the discipline of the church. Whatever equities might arise out of such a state of facts, the legal right to elect trustees of the theological seminary, according to its charter, could not by any course of events which I can now think of, be transferred from the existing formally and duly constituted synod, to a body of men which had no regular or valid inception or constitution as a judicatory of the church, according to its rules. It becomes therefore important to see upon what this action of the minority, in 1858, was based, and for this purpose we must go back a short distance in the history of this church.

The Associate Reformed Church in this country originated in the union of two bodies of Scotch Presbyterians, known as the Associate and the Reformed Presbyterian Churches. This union was accomplished in 1782. Without tracing the subsequent history of the church or of its organization, it is sufficient to say, that in 1855 there had

come to be a general synod of the presbyteries in the western states, including three particular synods at the west, and a separate synod of New York, which latter was the body to which the control of the theological seminary was confided, according to its charter. In 1855, the synod of New York united as a particular synod with the general synod of the west, which thus became the supreme legislative and judicial body of the Associate Reformed Church.

During all the time since 1782, however, there had existed a separate organization derived from those who objected to the union made in that year, who insisted that it involved a compromise or a surrender of principles, and who preserved a distinct organization as the Associate Church. This body had grown to be nearly as large as the Associate Reformed Church, or at least as that portion of the latter body which adhered to its general synod. In 1856 negotiations were entered into for a union of the Associate and the Associate Reformed Churches. These negotiations were conducted by the general synods of the churches, and at length, in 1858, resulted in a union of these two bodies, and the formation of a general assembly embracing the particular synods and presbyteries of the Associate and Associate Reformed Churches. This union was the act of the general synods of the two bodies exclusively; no votes were had in the particular synods or the presbyteries, except the advisory action of the presbyteries upon the plan or overture sent down to them by the general synod. It is indeed one ground of complaint by those who dissent from the union, that it was a stretch or usurpation of power by the general synod of the Associate Reformed Church, and was not effected or sanctioned by the concurrent vote or action of the presbyteries. In like manner individuals were not required, nor indeed permitted, to take any direct part in the act of union, other than by their votes in the bodies to which they belonged, and by their adherence to those bodies after the general synod with which they were

connected had agreed to unite with the Associate Church. It was a portion of this plan of union that the several Associate Reformed Synods and presbyteries should continue, and retain their separate existence and control over any property or funds under their respective charge. This part of the plan is stigmatized in strong language by the counsel for the defendants; but whatever may have been its design, it does not appear to me to be inconsistent with the formation of a general United Presbyterian Assembly, constituted of joint presbyteries, or of the presbyteries of either church acting in union with those of the other. It is not necessary at present to determine the ultimate consequences of the union accomplished by the two general synods, if that union should produce the application of property or funds belonging to the Associate Reformed Church, to the promulgation of tenets in conflict with the teaching of that church. It is only necessary to see at present whether the union of the general synods of the Associate and Associate Reformed Churches worked the extinction of the subordinate judicatories of these churches, or rather, whether the expression of approval or consent to that union by the persons who voted in the general synod *ipso facto* deprived them of membership in their church, and of a right to sit and act in its assemblies. The claim of the defendants goes to this extent, for as I have already said, the synod of New York, in October, 1858, as a body, had taken no action upon this plan of union, and the individuals whose position in the church and the synod was questioned, had never been called upon as individual ministers or elders or members of the church, to act in any way upon or under the proposed union. If Mr. Arnold, the moderator of the last preceding synod, had ceased to be a member of the church, and abdicated his office as moderator, it was because as an individual member of another body he had voted in favor of and taken part in the formalities attending the union of the two churches. If

the synod of New York had by a formal act entered into a coalition with another body, by which it had merged or lost its individual existence, and a portion of its members refusing to consent to or be bound by the act, had remained and organized themselves, the question as it would regard that remnant might be different. A question like this was presented to the chancellor of New Jersey in the case of *The Associate Reformed Church* agt. *The Trustees of the Theological Seminary*, (3 *Green Ch. R.*, 79.) The general synod of the Associate Reformed Church in 1822 formed a union with the general assembly of the Presbyterian church, by which it surrendered its separate existence, and became merged in the latter body. This involved the transfer to the latter of the library and funds of the seminary which was under its charge and was not then incorporated. There was a considerable portion of the Associate Reformed Church who, refusing to become connected with the Presbyterian church, remained adhering to their peculiar tenets and their separate organization. They constituted, of necessity, the Associate Reformed Synod, if that body any longer existed, and they proceeded by bill against the Princeton Seminary, to whom their church property had been transferred. The chancellor of New Jersey held that the surrender of the majority of the Associate Reformed Synod, although it might have the effect of merging them in the Presbyterian church, did not put an end to the body which they left, if there remained any constituents to form and re-produce, or rather continue, that body. He held, also, that it was a breach of trust to devote the property which had been contributed for the supply of the ministry of the Associate Reformed Church, to the use of another denomination; and on these grounds he administered the relief sought.

But the question between these parties is, as I have said, one of legal right, not of the administration of a trust or a charitable use. It is a question only of the right of certain

persons to sit in the Associate Reformed Synod of New York. I have been unable to see how the gentlemen who seceded from their associates at York, in October, 1858, were authorized to determine or to assume, or how the court can delare, that the participation of Mr. Arnold as a commissioner to the general synod in the completion of a union with another body of christians under a common government, had *ipso facto* destroyed his church membership, and vacated his church office, while the church to which he belongs still survived, and was intended to survive, and he declared his intention of continuing his connection with it.

The learned counsel for the defendants insist, that by their action as individuals, Mr. Arnold and those who concurred with him, had joined a different religious body from the Associate Reformed Church to which they had belonged, as if they had become members or office-bearers in the Episcopal or the Methodist church. I am not prepared to admit the analogy of the present case to such a supposed state of facts. The United Presbyterian Church is rather a name for the union or combination of two religious bodies, each of which was to retain its own organization, and might apparently adhere to its own opinions, so far as they differ from each other. The United Church was not an existing body in which synods or individuals might or should have become merged. The union between the two synods, in 1858, was essentially different from the surrender to the general assembly in 1822. I do not, therefore, feel called upon to decide whether the act of becoming connected with another religious body, would of itself dissolve the connection of an individual with this church. If it were necessary to decide such a question as far as mere legal rights and conditions were concerned, I should not think that such an act alone would *ipso facto* exscind the member, if he had not renounced his church. It may be a part of the discipline of this or of other churches, to forbid such an irregular connection with another body ; but until the discipline was

applied, by an expulsion of the offender, I do not see that his legal rights or position would be affected. Indeed, if the act of the member of itself terminated his connection with the church ; no discipline could be exercised upon him.

After a diligent consideration of the case, aided by the very able arguments of the counsel on both sides, I have arrived at the conclusion that I am not required or authorized to go beyond this point. I am of the opinion, that the action of the persons who constituted the body from which the defendants derive their title, was premature and irregular ; that it was a secession from the synod, and not the constitution of the true synod ; and that it cannot be relied upon to confer any legal rights.

I must therefore hold that the plaintiffs are entitled to judgment.